**STATE OF NEW MEXICO**
**BEFORE THE PUBLIC EDUCATION DEPARTMENT**
**DPH No. 2324-14 (Santa Fe Public Schools)**

**HEARING OFFICER'S MANIFESTATION**
**MEMORANDUM DECISION AND ORDER**
**ON APPEAL**

THIS MATTER arises on the Petitioner's Expedited Due Process Request, filed with the State of New Mexico Public Education Department on February 8, 2024 (Due Process Request), in an appeal of the LEA's Manifestation Determination. The Petitioner's Due Process Request is granted in part.

**PROCEDURAL BACKGROUND**

A Prehearing Order, Expedited Hearing, was entered on February 13, 2024. *See* Prehearing Order, Expedited Hearing, February 13, 2024 (Prehearing Order). The Respondent LEA responded to the Petitioner's Due Process Request on February 19, 2024. *See* [LEA's] Answer to Expedited Due Process Request, February 19, 2024 (Answer). The parties timely filed their respective Witness and Exhibit Lists. *See* Petitioner's Exhibit List, February 21, 2024 (P's Ex. List);  Petitioner's Witness List, February 21, 2024 (P's Witness List);  Petitioner's First Amended Witness List, February 21, 2024 (P's Amended Witness List); Respondent's Proposed Witness List, February 21, 2024 (R's Witness List); and Respondent's Exhibit List, February 21, 2024 (R's Ex. List).  Petitioner filed a proposed statement of issues on February 23, 2024 (P's Issues).

The Expedited Due Process Hearing commenced on February 27, 2024.  It was "in-person," and then in recess until March 1, 2024.  TR. Vol 1.  With the concurrence of

1

EXHIBIT

1

counsel, the hearing reconvened on Friday, March 1, 2024, virtually, and concluded on that day.  TR. Vol. 2.  Online cameras and video screens allowed the participants to view, hear, and speak with one another simultaneously.  *Id*.

Both parties were well-represented by their respective trial counsel.  Proposed Findings of Fact and Conclusions of Law, with written argument, were ordered due on March 7, 2024.  TR. 468.

The Respondent filed its proposed Findings of Fact and Conclusions of Law on March 7, 2024 (R's F&C).  It also filed its Closing Brief on March 7, 2024 (R's Closing Brief). The Petitioner filed Proposed Findings and Conclusions of Law on March 7, 2024 (Ps' FFCL). The Petitioner also filed Closing Argument on March 7, 2024 (Ps' Argument).

This decision is due on or before March 15, 2024.

## ISSUES

(1)  Whether the Student's behavior was caused by, or in direct and substantial relationship to, the Student's disability.   P's Issue 1, P's Argument, P's FFCL.

(2)  Whether the Student's behavior was the direct result of the LEA's failure to implement the Student's IEP.  P's Issue 1, P's Argument, P's FFCL.

(3)  Whether the LEA's removal of the Student to an IAES on January 29, 2024, and the resulting application of regular school discipline in a long-tern suspension violated the Student's rights under the IDEA.  P's Issue 2.

(4)  If the Petitioner is successful with the claims, then what compensatory relief, if any, should be awarded.  P's Issue 3.

## RELEVANT LEGAL OVERVIEW

The burden of proof rests with the party challenging the IEP. *See Schaffer v. Weast*, 546 U.S. 49 (2005); *Johnson v. Indep. Sch. Dist. No. 4*, 921 F.2d 1022 (10th Cir. 1990).   In this action, the burdens rest, therefore, with the Petitioner.

A child's unique needs in obtaining a free appropriate education, as well as the services to meet those needs, are developed through the IEP. *See* 20 U.S.C. § 1410(20). The setting is to be in the least restrictive environment. *Murray v. Montrose County Sch. Dist.*, 51 F.3d 921, 926 (10th Cir. 1995). Mainstreaming to the maximum extent possible should take place if the child cannot be educated full-time in a regular education classroom with supplementary aids and services. *See L.B. v. Nebo*, 379 F.3d 966, 976-978 (10th Cir. 2004). Parents do not have the right to compel a school district to employ a specific methodology, provide a specific teaching program, or assign a particular teacher. *Bd. Of Educ. v. Rowley*, 458 U.S. 176, 207-208 (1982).  The cornerstone for analysis of whether a free appropriate public education has been or is being provided is within the four corners of the IEP itself. *See Sytsema v. Academy Sch.*, 538 F.3d 1306, 1316 (10th Cir. 2008). The focus of the IEP is to be on the text of the document developed, so to avoid possible factual disputes later. *See Id.*

The IEP is to be implemented as soon as possible after the IEP meeting. *See* 34 C.F.R. § 300.323(c)(2). Various steps must be followed not only to design an IEP, but to implement it as well. *See Johnson v. Olathe Dist. Unified Sch. Dist. No. 233*, 316 F. Supp.2d 960, 970 (D. Kan. 2003).

If a child with a disability is removed due to disciplinary changes in placement exceeding 10 consecutive days then a manifestation determination is required within 10 school days of the decision to change placement. 34 C.F.R. § 300.530(b)(2), (e). The relevant IEP Team members, including the parent, must review all of the relevant information in the student's file, including the IEP, teachers' observations, and relevant parental information. 34 C.F.R. § 300.530(e). The team is to determine if the child's conduct "was caused by, or had a direct and substantial relationship to, the child's disability," or if the child's disciplinary conduct directly resulted from the LEA's failure to implement the IEP. *Id.* If the conduct is determined not to be a manifestation of the disability then the LEA may apply disciplinary action in the same manner and for the same duration as it would for a child without a disability, except that the child would still be entitled to a FAPE in the new setting and to receive behavioral intervention services and modifications addressing the behavior so that it does not recur. 34 C.F.R. § 300.530(d). If the behavior is determined to be a manifestation of the disability, then the IEP Team must either conduct a functional behavioral assessment behavioral assessment, unless conducted before, and implement a behavioral intervention plan, or, if a behavior plan had already been developed, then modify it as necessary to address the child's behavior.   34 C.F.R. § 300.530(f).

In relevant part, if a parent disagrees with the LEA's disciplinary determination or placement, then an appeal may be taken to a Hearing Officer by filing a complaint.  34 C.F.R. § 300.532.  In relevant part, the appeal parameters are under 34 C.F.R. §§ 300.530 & 531. *Id.*

A plain reading of the federal regulations provides that the only relief a Hearing Officer may order, if any, is to:

(1) return the child to the placement from which the child was removed (a parent's remedy); or

(2) order an interim change of placement to an alternate educational setting if current placement for not more than 45 days if the placement will substantially likely result in injury to the child or others (the LEA's remedy, if raised by the LEA).

*See* 34 C.F.R. § 300.532(b).

## FINDINGS OF FACT

1.      The District is the Local Educational Agency (LEA) for Student.

2.      Student is a 9-year-old who has attended 4th grade at the District's P Elementary School for the current school year.

3.      Student has been identified as a student with disability eligible for receipt of special education services since preschool.  Student has had IEPs since then.  TR 2/27/24 p. 137 lines 8-17 (AO).

4.      Student has been identified as eligible for special education on the basis of Other Health Impairment. Ex. P.4, p. 1.

5.      Student has also been identified as a Gifted Student since kindergarten.TR 2/27/24 p. 137 lines 18-22 (AO).

6.     Parent is a 4th grade teacher in the District at an elementary school other than P Elementary.

7.     On January 29, 2024, the District suspended Student for behavior occurring on that date.  This suspension was Student's 11th day of suspension for the current school year. Ex. P.9, p.1. The District convened a manifestation determination review (MDR) that same day.

8.     The District determined that Student's January 29, 2024, behavior was not a manifestation of his disability: that the behavior was neither caused by, nor in direct, substantial relationship to Student's disability, nor a direct result of the District's failure to implement Student's IEP.  Ex. P.9, p. 2.

9.     Parent filed this expedited due process to challenge the January 29, 2024, MDR.  Parent challenges the MDR on two grounds: (1) Student's behavior on January 29, 2024, was caused by, or in direct, substantial relationship to Student's disability, and (2) Student's behavior on January 29, 2024, was a direct result of the District's failure to implement Student's IEP.

10.     The description of the behavior was documented in the MDR form discussed and completed at the meeting.  Ex. P.9, p. 1.

11.     On January 29, 2024, Student's behavior began with refusal to engage in math work in the general education classroom.  At this time, Student was in his general education math class, with 19 other students and one general education teacher. TR 2/27/24 p. 284 lines 13-17 (RB). There was no other adult or assistant in the general

education classroom.  *Id.* at p. 284 lines 18-23, p. 300 lines 14-22 (RB).  Although the

teacher attempted to engage Student, Student did not respond by engaging in the

classroom instruction. *Id.* at p. 299 lines 10-25, p. 300 lines 1-13 (RB). Student left the

classroom, laid on the floor in the hall outside of the classroom, and began to hold the door

of the classroom closed.  *Id.* at p. 290, line 25, p. 291 lines1-5 (RB).  At that point, the

teacher called for assistance, and the principal responded, followed by the school social

worker.  *Id.* at p. 291 lines 15-17, p. 292 lines 2-3 (RB), p. 248 lines 2-16 (PS). Student

agreed to go with the social worker to her office where he stayed for 2 one-half hour

sessions of social work with other students.  Ex. P.9, p. 1, TR 2/27/24, p. 248 lines 18-24,

p. 249 lines 9-21 (PS).

      12.    When the social worker tried to walk Student and her other student back to

class, Student began turning lights on and off in the hallway and closing doors.  *Id.* at p.

249 lines 24-25, p. 250 lines 1-9 (PS). The social worker agreed to take Student for a 15-

minute recess since he had missed recess.  *Id.* at p. 253 lines 2-15 (PS). After 15 minutes,

Student refused to come in from recess, even when given an extra 5 minutes. *Id.* at p. 253

lines 17-25, p. 254 line 1 (PS). The social worker called for assistance from the assistant

principal. *Id.* at p. 254 lines 2-14 (PS).

      13.    The assistant principal asked Student to come in, stating they would have to

call his parents if he wouldn't come back inside, and he refused, yelling that he did not

want to go home. *Id.* at p. 254 lines 14-23 (PS). Student got upset and started throwing

woodchips at the assistant principal.  *Id.* at p. 374 lines 5-8 (JG). The assistant principal

asked the social worker to call Student's Parent. *Id.* at p. 374 lines 10-11 (JG), p. 255 lines 6-7 (PS).  At that point, Student ran inside to the social worker's room, grabbed her phone from her hand, got under her desk and licked her phone. *Id.* at p. 255 lines 8-11.

14.     After this, Student went to the school's main office area and engaged in a series of behaviors:

- Hanging up the secretary's phone as she was trying to call Parent; Ex. P.21, Video 1, approx. 10:21;

- Using the secretary's phone to call Parent and speak with her for about 3 minutes; *Id.*, approx. 11:24;

- Going under another secretary's desk and unplugging all of her technology; Ex. P.21, Video 2, approx. 2:22;

- Grabbing the assistant principal's radio off a table and throwing it in the garbage; *Id.*, approx. 3:52;

- Forcefully pushing the assistant principal from behind in the back when she went to grab her radio out of the trash; *Id.* approx. 4:13;

- Stapling papers together using a stapler on a table; *Id.* approx. 5:22;

- Using the stapler to shoot staples at the social worker; Ex. P.21, Video 3, approx. 12:48;

- Office staff were fearful of the Student's action; Ex. 21.

- The only descalation appeared to be allowing the Student continue with his behaviors ; Ex. 21.

8

- Grabbing scissors and cutting the secretary's balloon strings, setting the scissors down, then going outside. Ex. P.21, Video 4, approx.:20, 50.

15.     Once outside, student let the balloons go.  Ex. P.9 at p. 1.  He then began throwing rocks at 6th graders and hit another student with a rock. *Id.* He also was walking on high walls outside. *Id.* Student's stepfather arrived, and Student came inside with him. *Id.*

16.     The District called Parent during the behavior, requesting that she come and pick Student up from school.  TR 2/27/24 p. 161 lines 3-7 (AO).  Soon after the first call, Parent received a call from Student.  Student told Parent that he didn't want her to come get him, he did not want to be suspended, he did not know what was going on and that the school just wanted to send him home.  TR 2/27/24 p. 161 lines 10-25 (AO). Parent arranged for Student to be picked up by his stepfather.  TR 2/27/24 p. 163 line 1 (AO).

17.     Student's relevant IEP with an amendment date of March 15, 2023 documents that he is a Student with an Other Health Impairment with identified areas of need of Facioscapulohumeral muscular dystrophy (FSHD), Sensory Processing Delay, ADHD – Predominantly hyperactive/impulsive presentation, Other Specified Disruptive Impulse-Control Disorder with difficulties including noncompliance, temper outbursts, argumentativeness and labile mood, Executive Functioning Organization, Behavior Functional Communication, Behavior Decrease Challenging Behaviors, Written Language, and Auditory Processing.  Ex. P.3, p.1.

18.     A subsequent IEP dated December 13, 2023, documents that he is a Student with an Other Health Impairment with identified areas of need of Facioscapulohumeral muscular dystrophy (FSHD), Sensory Processing Delay, ADHD – Predominantly hyperactive/impulsive presentation, Other Specified Disruptive Impulse-Control Disorder with difficulties including noncompliance, temper outbursts, argumentativeness and labile mood, Executive Functioning Organization, Behavior Functional Communication, Behavior Decrease Challenging Behaviors, Written Language, Auditory Processing, and Anxiety.  Ex. P.4, p.1.

19.     ADHD-Predominantly Hyperactive/Impulsive Presentation and Other Specified Disruptive Impulse-Control Disorder with difficulties in non-compliance, temper outbursts, argumentativeness and labile mood have been included in Student's IEPs since the end of preschool.  TR 2/27/24 p. 138 lines 1-13 (AO); Exs. P.2, P.3, P.4.

20.     Before the MDR on January 29, 2024, no one at the District had ever advised Parent that Other Specific Disruptive Impulse-Control Disorder could not be considered part of Student's disability for special education purposes.  TR 2/27/24 p. 138 lines 14-25 (AO).

21.     Student was diagnosed with ADHD-Predominantly Hyperactive and Impulsive Presentation (ADHD) and Other Specific Disruptive Impulse Control Disorder (Disruptive Impulse-Control Disorder) as a result of a 2020 neuropsychological evaluation conducted at the University of New Mexico Hospitals, Center for Neuropsychology Services, Department of Psychiatry (UNM Neuropsychological Evaluation).  Ex. P.16, p. 8; TR 2/27/24 p. 138 line 25, p. 139, lines1-16 (AO).

22.     The UNM Evaluation Report noted that "[c]o-occurring behavioral concerns are extremely common among children with ADHD, likely due to high rates of difficulties in impulse control and self-regulation in ADHD."  Ex.16, p. 7. Behavioral concerns noted at that time included "frequent tantrums and non-compliance, as well as occasional aggression."  *Id.* Parent understood that Student was diagnosed with ADHD and Impulse-Control Disorder as co-occurring diagnoses.  TR 2/27/24 p. 140 lines 5-14 (AO).

23.     The UNM Neuropsychological Evaluation report is contained in Student's records and has historically been part of the basis of his Other Health Impairment and disability for the purposes of the IEP.   Ex. P.2, pp. 1, 5; Ex. P.3, pp. 1, 7; Ex. P.; Ex. P.4, pp. 1, 6; Ex. P.13, pp. 2, 12; Ex. P.15, p. 8; Ex. P.19, p. 2.

24.     In October 2022, the District conducted a comprehensive psychoeducational re-evaluation of Student by a school licensed educational diagnostician, Ali Gibson.  Ex. P.15. That evaluation noted the diagnoses of ADHD and Disruptive Impulse Control Disorder in the 2020 UNM Neuropsychological Evaluation but did not do any evaluations related to those areas of Other Health Impairment/disability. The District's evaluation focused on academic functioning and achievement.  *Id.* at pp. 1, 8.  In the reevaluation report, however, the evaluator noted that Student "continues to meet criteria as a student with an Other Health Impairment and Gifted."  *Id.* at p. 17.

25.     In a Reevaluation Eligibility Determination after the 2022 psychoeducational evaluation, the Eligibility Determination Team determined that Student continued to be

eligible for special education under the category of Other Health Impaired and that the

team did not require additional information to make that determination.  Ex. P.19, p. 2.

26.    In late 2022, the District conducted an autism evaluation by a school

neuropsychologist, Dr. Alison Le Grand.  Ex. P.13.  As part of this evaluation, Dr. LeGrand

administered the Behavior Assessment System for Children-3 (BASC-3) rating scales to

Parent and Student's teacher.  *Id.* at pp. 6-7. Dr. LeGrand concluded that Student was rated

in the Clinical Range of Externalizing Problems which included Hyperactivity, Aggression,

and Conduct Problems.  *Id.* at p. 7.  Specifically, the evaluation reported:

> Hyperactivity was rated as a clinical concern by the teacher and
> parent, consistent with his previous diagnosis of ADHD.
> Aggression was rated in the at-risk (teacher) to clinical (parent)
> ranges, suggesting that [the Student] has trouble with self-
> regulation and lashes out at others when upset.  Conduct
> problems were rated in the clinical range by both the teacher
> and parent, suggesting difficulties for Student with following
> rules and acting out when frustrated at home and school.

*Id.*

27.   Dr. LeGrand further reported that Student's BASC-3 ratings

indicated clinical concerns with the Student externalizing problems overall,

and specifically hyperactivity and conduct problems, which were consistent

with the diagnosis of ADHD-Predominantly Hyperactive/Impulse Presentation

and Other Specified Disruptive Impulse-Control Disorder.  *Id.*

28.   According to Dr. Le Grande, the Student was rated by teacher

and parent as in the clinical range of same-aged peers in terms of the

Behavioral Symptoms Index which consists of Hyperactivity, Aggression,

Depression, Attention Problems, Atypicality, and Withdrawal scales and reflects the overall level of problem behavior of the child. *Id.*

29.  Dr. Le Grand also referred to the UNM evaluation report as the source of the medical diagnosis for these two conditions and did not request an updated medical diagnosis from Parent.  *Id.* at p. 2.

30.  The New Mexico Technical Assistance in Evaluation Manual (TEAM) does not require a medical diagnosis to support Other Health Impairment eligibility and does not require a new medical diagnosis upon reevaluation. *See* Technical Evaluation and Assessment Manual (New Mexico T.E.A.M.), available at

https://webnew.ped.state.nm.us/wp-content/uploads/2018/02/NM-TEAM-Technical-Evaluation-and-Assessment-Manual.pdf, pp. 223, 225-226; TR 2/27/24 p. 133 lines 16-25, p. 134 lines 1-2 (discussion of N.M. T.E.A.M.).

31.  After the MDR, Parent provided the District with SFPS Physician Statement of Student Health Need Form completed by Student's pediatrician.  The Health Need Form documented that Student continues to be diagnosed with ADHD, Disruptive Impulse Control Disorder, and Anxiety.  Ex. P.23.  Parent provided the information on the SFPS Physician Statement of Student Health Need Form completed by Student's pediatrician as it was the form provided to her by the District's nurse for this purpose.  *Id.*; TR 2/27/24 p. 142 lines 18-25, p. 143 lines 1-20 (AO).

32.  Parent provided the District SFPS Physician Statement of Student Health Need Form completed by Student's pediatrician in the spring of 2023 documenting that Student

had been diagnosed with anxiety.  Ex. P.17.

33.  Students with ADHD with impulsivity and Impulse-Control Disorder, like Student, have a hard time self-regulating and can have aggression, elopement, and inappropriate verbal communication.  TR 2/27/24 p. 93 lines 19-25, p. 94 lines 1-25, p. 95 lines 1-25 (SK).

34.  Student's disability causes Student to be impulsive.  See Ex. P.16; Ex. P.13. *See also* TR 2/27/24 p. 245 lines 6-23 (PS); TR 3/1/24 p. 436 lines 11-15 (DA)(Student is extremely impulsive and lacks the ability to self-regulate).Once Student escalates in his behavior, it can be hard to get him to self-regulate.  TR 2/27/24 p. 112 lines 5-25 (SK).  If he is frustrated and not able to self-regulate, then he becomes highly impulsive.  He will do things without thinking and will go from thing to thing.  TR 2/27/24 p. 149 1ines 5-25, p. 150, lines 1-12 (AO).

35.  Historically, Student has had a lifetime struggle with transitions from preferred to nonpreferred tasks and from a less structured setting to a more structured setting.  TR 2/27/24 p. 148 1ines 1-8(AO), TR 2/27/24 p. 242 lines 1-24 (PS).  Student's struggles with transitions include returning to class after social work services or PE.  *See*, *e.g.*, Exs. P.24, P.25, P.26.

36.  Behaviors in the school setting have included noncompliance or noncooperation which could lead to tantrums, elopement, lying on the ground, screaming, throwing objects (e.g., pencils), vocal agitation and physical aggression.  TR 2/27/24 p. 101 lines 101-102 (SK).

37.  Student's IEP reflects the importance of addressing these disability-related behaviors:

    a.  The Present Levels of Functional Performance section of Student's IEP details the social/emotional and behavior area of identified need for Student resulting from his disability.   Ex. P.4, pp. 19-25.

    b.  Student's IEP includes goals and objectives for self-regulation, communication, elopement, and aggressive behavior.  Ex. 4, pp. 19-25. Student is not able to independently access self-regulation strategies when he is frustrated or escalated.TR 2/27/24 p. 148 1ines 15-25, p. 149 lines 1-5 (AO).

  c.  The Prior Written Notices for Student's IEP document that he needs "explicit instruction in self-regulation and self-awareness." Ex. 4, p. 38.

38.  Student has had Functional Behavior Assessments and a Behavior Intervention Plans (BIP) as part of his educational program.  Student's most recent Functional Behavior Assessment is dated February 25, 2023.  Ex. P.7.  His most current BIP is also dated February 15, 2023.  Ex. P.8.

39.  Student's BIP identifies target behaviors of refusal, verbal aggression, and physical aggression.  Ex. P.8. Student's elopement is related to refusal.  TR 3/1/24 p. 443 lines 1-5 (DA).

40.  Student's IEP includes services designed to address Student's behaviors and to support staff who work with Student, such as the supplementary aid and

service of District Behavior Support staff, behavior support from a special education teacher in the regular education classroom, social work services, and a 1:1 educational aide assigned to Student.  *See* Ex. P.4, p. 34-35; TR 2/27/24 p. 152 1ines 3-25, p. 152 line 1 (AO), p. 103 lines 12-25, 104 lines 1-14, p. 112 lines 19-25, p. 113 lines 1-20, p. 115 lines 4-18 (SK).

41.   Student's behaviors periodically escalate and occur with more frequency. The last FBA of Student acknowledged that Student's behaviors could escalate after winter break.  Ex. P.7, p.1.  Student has escalations after most breaks of extended weekends.   TR 2/27/24 p. 176 lines 10-25, p. 177 lines 1-7 (AO). Student has been determined eligible for ESY on the basis of his regression in behaviors after breaks in school. *Id.*  This can include vacations in the school year, like the winter, spring, or summer break, or over long weekends. *Id.*

42.   The antecedent to Student's January 29, 2024 behaviors was the math instruction and practice he refused to engage in initially when he first left the classroom and is part of the behaviors that are addressed in Student's IEP and BIP. TR 2/27/24 p. 123 lines 3-25, p. 124 lines 1-9 (CM).  After attending the two social work sessions, Student refused to return to his general education classroom and engaged in a series of behaviors to avoid returning to the classroom.  At the point when Student was in the office area on the floor with the chair over him, the assistant principal described him as "already kind of escalated to where if I said anything to him, I think it just upset him more."  TR 3/1/24 p. 375 lines 1-8 (JG).

16

She described Student's "escalation" as "a point where you can't really say anything to [Student] without him saying no and he's not going to do it."  TR 3/1/24 p. 400 lines 1-5 (JG).  Usually by the time she was called to intervene with Student's behaviors, "he's already escalated to the point where he kind of refuses to listen to anybody."  TR 3/1/24 p. 372 lines 8-10 (JG); *see also* Ex. P.26.

43.  In a 2/1/24 Present Level note in Student's IEP, Student was described by the school social worker as having erratic behavior and as "[h]e doesn't understand why he escalates situations or why he comes physically aggressive with others."  Ex. P.4, p. 19. Additionally the social worker voiced her impression that the Student did not feel there would be consequences to his actions other than being sent home from school.  *Id.*   During the January 29th incidents, in response to his social worker's questions about why he was behaving as he was, he gave thought to the question but told her "he didn't know why he was doing those things."  TR 2/27/24 p. 250 lines 15-25, p. 251 lines 1-6 (PS).  Student's "difficulty with reasoning/problem-solving skills negatively interferes with his ability to generate possible solutions."  Ex. P.4, p. 20.

44.  Student's pushing of the assistant principal was a major concern of the District's in terms of Student's behavior on January 29, 2024.  TR 2/27/24 p. 80 lines 16-22 (CM).   Aggression has long been treated as a disability-related behavior that is the subject of his IEP and BIP.  *See* Ex. P.4 at 19-25, Ex. P.7, Ex. P.8, Ex. P.11.

45. The December 13, 2023, IEP was developed on December 13, 2023, with the exception of a few items that were addressed at a follow up meeting on February 2, 2024. At the conclusion of the December 13, 2023, IEP meeting, the IEP team had a few minor things to complete, a question by Parent about a goal, reviewing the Prior Written Notice, and a progress documentation page.  Ex. P. 4, p. 43; TR 2/27/24, pp. 21 lines 4-25, p. 22 lines 1-10 (CM).

46.  At the December 13th IEP meeting, the District told Parent that they would move forward with implementing the December 13th IEP.  TR 2/27/24 p. 155 lines 4-9 (AO).  The District was implementing the December 13, 2023, IEP after the meeting that day.  TR 2/27/24 p. 23 lines 14-20, p. 78 lines 10-25, p. 79 lines 1-7 (CM).

47.  The IEP in force at the time of the Student's conduct was the December 13, 2023 IEP -- not the March 15, 2023 IEP -- it is the December 13, 2023 IEP upon which implementation will be measured.

48.  Historically, Student started the current school year without having had the ESY services.  Ex. P.4, pp. 39-40; TR 2/27/24 p. 172 lines 3-12, p. 177 lines 1-7 (AO).

49.  At the December 13, 2023, IEP meeting, the District agreed to provide Student with one hour of Behavior Support services from District staff for 22 weeks as compensatory education for ESY.  Ex. P.4, pp. 39-40; TR 2/27/24 p. 171 lines 15-25, p. 172 lines 1-25, p. 173 lines1-4 (AO).

50.  The supplementary aid and service of a BCBA had been included in Student's IEP since kindergarten, until the December 13, 2023, IEP.  TR 2/27/24 p. 22 lines 11-25, p. 23 lines 17-20 (CM); TR 2/27/24 p. 152 1ines 9-11 (AO).

51.  In the fall of 2023, Student was provided with the IEP-required BCBA services until approximately November 7, 2023.  TR 2/27/24 p. 36 lines 7-15, p. 54 lines 5-12 (CM); p. 166 lines 3-11 (AO).

52.  Under the March 15, 2023 IEP, BCBA support ended on November 21, 2023.  Ex. 3, p. 36.

53.  At the December 13, 2023, IEP meeting, the District proposed to continue consultation services, training, and modeling by Behavior Support through SFPS staff and Parents.  Ex. P.4, p 41.  The reason for the team's acceptance of this proposal was explained as "[b]ased on data collected by BCBA and captured in the Functional Behavior Analysis (FBA), this is required to meet the student's needs as articulated in his Behavior Intervention Plan (BIP)." *Id.*  The District proposed this service because it wanted to help Student continue to find success and be successful within the school setting."  TR 2/27/24 p. 54 lines 15-25, p. 55 lines 1-9 (CM).

54.  Parent requested that a BCBA be used to provide this supplementary aid and services which has been a support identified in Student's IEP.  The District noted that "[a]t this time, the District does not have a BCBA, so the terms behavior support is being used in place.  If and when the district can get a BCBA again, the team can reconvene and add BCBA to the wording." *Id; see also* TR 3/1/24 p. 440

lines 11-14 (DA)(no IEP meeting where team decided Student did not need support of a BCBA).

55.   During this same period of time, Student's removals from school in the form of suspensions increased and Student's behaviors were escalating.  TR 2/27/24 p. 165 lines 10-15 (AO).

56.   After December 13, 2023, the District had winter break until January 3, 2024.  The assigned District Behavior Support staff (CA) did not have any contact with Parent either before or after the December 13, 2023, IEP meeting, the January 29, 2024, MDR, or the February 2, 2024, IEP meeting.  TR 2/27/24 p. 170 lines 17-25, p. 171 lines1-15 (AO).

57.  The District did, after the winter break, begin to provide Student with compensatory education services owed for services not provided in the summer of 2023.  This was compensatory education services and not the supplementary aid and services intended by the IEP's requirement of three hours of Behavior Support designed to provide consultation and modeling for the team and providing weekly tracking and analysis of behavior to be provided to Parent and Student's case manager.  See TR 2/27/24 p.55 lines 12-25 (CM); p. 171 lines 15-25, p. 172 lines 1-5 (AO).

58.   On December 13th, Parent was asked to sign consent for a new FBA.  She took the consent form home for review.  Parent signed the consent and returned it to school with Student that day and put a note in Student's planner for his special

education teacher.  TR 2/27/24 p. 153 lines 13-25, p. 154 lines 1-9 (AO).  The

District did not receive the consent form signed by Parent and did not follow up with

Parent.  TR 2/27/24 p. 85 lines 9-18 (CM), p. 154 lines 24-25, p. 155 lines 1-3 (AO);

TR 3/2/24 p. 359 lines 8-10 (CB).

59.  Parent first learned that the District had not received the consent form at

the MDR.  TR 2/27/24 p. 154 lines 10-25, p. 155 lines 1-3 (AO).  Parent was given

another consent form during the 2/2/24 IEP, which she signed. TR 2/27/24 p. 85

lines 19-21 (CM).

60.  In January 2024, Student's general education teacher (RB) created her

own behavior tracking form for Student to track the behaviors of concern related to

Student's disabilities.  Ex. P.20. The behaviors she tracked were consistent with

Student's BIP target behaviors:  verbal aggression, physical aggression, refusal, and

elopement.  *Id.*; TR 2/27/24 p. 40, lines 18-25, p. 41, lines 1-4 (CM).  This

information was not shared with Parent.  TR 2/27/24 p. 173 lines 6-24 (AO).

61.  The December 13, 2023, IEP requires that Student be provided with a

1:1 aide, an Educational Behavioral Health Assistant (EBHA), for 1342 minutes

weekly.  The plan was to have the 1:1 EBHA with Student at all times during the

school day.  The IEP indicated that the services were to start on December 13,

2023, and continue to December 13, 2024.  Ex. P.4, pp. 34, 41-42; TR 2/27/24, p.

60 lines 16-25, p. 61 lines 1-4 (CM).

62.  The proposal for the EBHA was made by the District.  The reason for

acceptance of the proposal is explained as "the team agrees that a 1 to 1 EBHA is

needed to support [the Student] at this time due the (sic) behaviors he is exhibiting

in the school setting.  The EBHA will be trained by the district behavior specialists in

implementing the IEP and BIP as well as strategies that work well with him.  As

[Student's]'s behavior improves, the EBHA will be decreased, but will remain in the

school setting in case they are needed for a behavioral outburst."  Ex. P.4, pp. 41-

42; *see also* TR 2/27/24 p. 61 lines 11-25 (CM).

63.  At the IEP meeting, the team discussed that an aide would allow Student

to remain in the general education setting and acquire skills that were lagging.  The

team discussed that the aide would be trained similarly to what was done in the past

which included training of the aide by the BCBA on the BIP, IEP, and Student's

behaviors so they could support Student and other school staff who interact with

Student on a regular basis.  TR 2/27/24 p. 158 lines 24-25, p. 159, lines 1-16 (AO).

64.  The Aide was intended to be proactive and not reactive, and to ensure

that the Student did not reach the point of elopement.  The Aide could notice the

precursor behaviors, agitated vocals, increased fidgeting or spinning.  TR 2/27/24 p.

150 lines 17-25 (AO).

65.  At the time that the IEP team determined that Student's IEP would

include the 1:1 EBHA, Student was refusing to do work, eloping, leaving class

without permission, running around campus, and having incidents of aggressive

behavior. *See, e.g.,* Exs. P.11, P.24, P.25, and P.26.  These were the types of related behaviors addressed in Student's IEPs intended to be addressed by the provision of a 1:1 EBHA.  *See* TR 2/27/24 p. 61 lines 23-25, p. 62 lines 1-25, p. 62 lines 1-2 (CM).

66.  At the December 13th IEP meeting the District acknowledged that it was not able to provide the EBHA as there currently was not one available and one would have to be hired.  TR 2/27/24 p. 63 lines 3-12 (CM).

67.  There was no discussion at the IEP Team about what other support would be provided to the Student due to the inability of the District to provide the needed and required EBHA.  Ex. P.4, TR 2/27/24 p. (A0).

68.  The District did not provide Student with the required 1:1 EBHA between December 13, 2023, and January 29, 2024, the date of the MDR and still does not have an EBHA for Student.  TR 2/27/24 p. 63 lines 11-13 (CM).

69.  Student did not have a 1:1 EBHA on January 29, 2024, the date of the incident leading to the MDR.  The District was attempting to hire a 1:1 EBHA for Student but had not done so yet.  TR 2/27/24 p. 53 lines 24-25, p. 54 lines 1-4 (AO).  At the MDR meeting, the District acknowledged it was still trying to hire the 1:1 EBHA. Ex. P.9, p. 2.

70.  Student had a 1:1 aide in prior school years.  The aide was intended to help support Student and the teacher to help reinforce functional communication and on-task behavior.  TR 2/27/24 p. 112 lines 22-25, p. 113, lines 1-3, p. 114 lines

1-18 (SK).  The aide was a successful service for Student, and he showed

substantial improvement when it was in place. TR 3/1/24, p. 465 lines 10-17.

71.  The District and Parent considered the December 13, 2024, IEP to be the

operative IEP for Student after December 13th. Ex. P.9. TR 2/27/24 p. 155 lines 4-9

(AO), p. 23 lines 14-20, p. 78 lines 10-25, p. 79 lines 1-7 (CM).

72.  At the time Student's January 29, 2024 behaviors began, he was in his

general education classroom with 19 other students.  There was no assistant in the

classroom to support Student.  TR 2/27/24 p. 293 lines 11-19 (RB).

73.  District witnesses claimed that there was adequate assistance for

Student without an EBHA because other staff attempted to assist Student's general

education teacher as their schedules allowed.  TR 3/1/24 p. 353 lines 2-7 (CB), p.

441 lines 11-25, p. 442 lines 1-5 (DA), p. 393 lines 15-25, p. 394 lines 1-24, p. 395

lines 1-8, 16-25, p. 396 lines 1-16 (JG).

74.  While District witnesses were under the impression after the fact at the

manifestation determination appeal hearing that an EBHA would not have

contributed to reducing the Student's action on January 29, 2024,  these

impressions are not based on underlying supportive data, rather, they are general

impressions and are given little weight -- the underlying basis is that the IEP of

December 13, 2023 required a EBHA, and this requirement by the IEP Team cannot

be deemed minimal or not a direct result of a failure to implement the December 13,

2024 IEP.

24

75.  CB, JG, DA-S, CMS, SK, PS, and RB are all credible to the extent it applies to truthfulness, although their perception is a bit tainted when it comes to weight given to their testimony. Their school assistant superintendent was assaulted (in the common understanding of the term, not by legal definition) by the Student, thus compelling their institutional sympathy for her, as a victim.  It is simply something to be considered.  JG noted that her impression was that the Student felt he knew what he was doing -- this steps into the place of the Student's mental state, through which she felt what her impression was of what the Student felt. CMS was a bit elusive, and was somewhat unfamiliar with documents presented.  RB was very well-spoken, noting that although she did not think a one-on-one aide may have helped the situation, she did state the IEP called for one-on-one assistance, and that the December 13, 2023 IEP was the IEP upon which she based her services. Testimony by LEA educators CMS, RB, JG, and DA-S as to ADHD and impulsivity discussion at the Manifestation Determination meeting is somewhat suspect, as well, given impeachment through a recording of the meeting as presented through witness DA-S.  TR. 457-458.  As noted for factual explanation, however, general reliance in this appeal is placed in many ways on the four corners of the December 13, 2023 IEP, which notes the identified areas of need, and testimony and materials relating to the December 13, 2023 IEP, with the Student's actions on January 29, 2024, as presented for this hearing on appeal, rather than what took place at the LEA's Manifestation Determination Hearing, upon which there was substantial testimony.  The issue is

what evidence exists for this hearing for a determination in the appeal by this Hearing Officer.  Other materials are in historical context only.  Nothing in these credibility determinations should be taken to suggest a misrepresentation by witnesses, but simply explains why the weight is given.  The Student's mother, AO, is deemed credible, truthful, perceptive, although as the party seeking relief her testimony is somewhat tempered by her self-serving interests -- her testimony is generally given weight.

76. Should there be a difference in testimony between competing testimony and the factual findings then it is found that credibility and weight are given to the testimony supporting the factual findings.

77. Factual determinations indicated in the Analysis and Conclusion section, below, if not stated above, are also by reference deemed as Findings, as are Conclusions if better described as Findings, and vice-versa.

## ANALYSIS AND LEGAL CONCLUSIONS

At the outset, it is important to discuss what this case is not about.  It is not about whether there was a violation of FAPE by having BCBA services ending while under the March 15, 2023 IEP, or by not having other services included.  It is not about whether there was a violation of FAPE by not having a BCBA placed into the December 13, 2023 IEP.  It is not about whether the Student's educational environment should have been more restrictive.  It is not about whether maintaining the Student in the current educational environment is substantially likely to result to injury to the Student or others.  To the extent testimony and

materials are factually cited beyond these parameters then they are for background reference only, much like the purpose of not opening a book to a middle chapter without having an idea of what led the reader to that chapter.

Rather, the issues presented in this manifestation determination appeal are: (1) whether the Student's behavior was caused by, or was in direct and substantial relationship to, the Student's disabilities, and also (2) whether the Student's behavior was the direct result of the LEA's failure to implement the Student's December 13, 2023 IEP, which was the IEP in force at the time to be implemented.

The LEA's position that the December 13, 2023 was not the IEP in place for implementation, reverting instead to the March 15, 2023 IEP, because the team was to reconvene in February 2024 after the Student's parent was to contact the LEA in January 2024 to address the Annual Individual Education Plan, is unpersuasive. *See* Ex. 4, 43. Both the Parent and members of the LEA's educational providers relied on the terms of the December 13, 2023 IEP for implementation after it was written. As LEA educator witness CB testified, the last IEP she used for provision of services was the IEP of December 13, 2023. TR. 363. Additionally, this interpretation is consistent with the requirement that the IEP is to be implemented as soon as possible after the IEP meeting. *See* 34 C.F.R. § 300.323(c)(2). It is found and concluded that the December 13, 2023 IEP is the IEP for implementation.

Recognizing that cornerstone for analysis for FAPE is within the four corners of the IEP itself, *see Sytsema*, 538 F.3d at 1316, portions of the December 13, 2023 IEP and Prior Written Notice will be explored in regard to the manifestation determination matters -- to

wit, what needs and services were required for the Student according to the IEP Team to address the Student's disabilities and behavioral concerns and to see if the Student's behavior was caused by or had a direct and substantial relationship to his disabilities, and/or whether his behavior resulted from the LEA's failure to implement the December 13, 2023 IEP.

According to the December 13, 2023 IEP, the Student's primary disability is Other Health Impairment, with identified areas of need of Facioscapulohumeral muscular dystrophy (FSHD), Sensory Processing Delay, ADHD – Predominantly hyperactive/impulsive presentation, Other Specified Disruptive Impulse-Control Disorder with difficulties including noncompliance, temper outbursts, argumentativeness and labile mood, Executive Functioning Organization, Behavior Functional Communication, Behavior Decrease Challenging Behaviors, Written Language, Auditory Processing, and Anxiety.  Ex. P.4, p.1. Behavior challenges are a concern, with the "surest way to bring on a tantrum is not to acknowledge his demands for attention." Ex. 4, p. 4.  The Student demonstrates impulsivity, with an ADHD Predominantly Hyperactive subtype diagnosed, and frequent tantrums and occasional aggression leading to a diagnosis of Other Specified Disruptive, Impulse Control Disorder.  Ex. 4, p. 6. Transitions were challenging for the Student.  Ex. 4, p. 17.  As a result, he was provided the services of 1342 minutes per week of behavior services to begin on December 13, 2023, and 180 hours weekly of behavior support, to begin on December 13, 2023.  Ex. 4, p. 35.  In further explanation of the IEP, the Prior Written Notice explains that the IEP Team agrees that a one-to-one EBHA is needed to support the Student due to the behaviors the Student exhibited at school, to be trained by behavior specialists to strategies

and implementation of the BIP and IEP, yet the LEA states that although needed, there were

then no EBHA's available.  Ex. 4, p. 41.  Additionally, to meet the Student's needs under his

BIP, consultation services, training, and modeling by behavior support by staff and parents

were required.  Ex. 4, p. 41.

In summary, as the factual findings show more fully, the Student subsequently went

on winter break, returned from that transition, and engaged in erratic behavior on January

29, 2023.  With only a general education teacher, and no EBHA, in a classroom of 19 pupils,

on January 29, 2024, he refused to engage in math work in the general education classroom.

The Student left the classroom and laid on the floor in the hall outside of the classroom, and

began to hold the door of the classroom closed.  The principal and social worker came to the

event, and then he went with the social worker for about 2 one-half hour sessions of social

work with other students.  After he left that classroom, he began turning lights off and on,

and shutting doors in the hallways.

Student was provided an outside recess, then refused to come in, and the assistant

principal arrived on the scene, where she told him she would call his parents if the Student

did not come inside, and the Student then began yelling that he did not want to go home,

and began throwing woodchips at the assistant principal.  When the social worker was asked

to call the Student's parents, the Student ran inside to the social worker's room, grabbed her

phone from her hand, and got under her desk and licked her phone.

The erratic behavior continued.  Thereafter, the Student went to the school's main

office area and hung up the secretary's phone as she was trying to call Parent, went under

another secretary's desk and began unplugging all of her technology after the Student spoke with his parents, grabbed the assistant principal's radio off a table and threw it the garbage, sat on the floor, then, while the assistant principal's back was turned against him, the Student oddly arose from behind her as she was retrieving her phone from the garbage can and pushed her.  The Student then began stapling papers together using a stapler on a table and shooting staples at the social worker, placing office staff in fear, and then grabbed scissors and cut balloon strings for balloons on a secretary's desk, and finally left the office area, and began to throw rocks at students, hitting a student, and then walked on a high wall before the Student's step-father arrived.

Having reviewed the video from the incident in the office, the Student was at times complacent, and then suddenly and randomly becoming fully disruptive and in escalation, there appeared to be no intent to develop a plan, or to consider actions, they sporadically occurred, as noted in the IEP about tantrums, noncompliance, temper outbursts, argumentativeness and labile mood.  These actions were consistent with the December 13, 2023 IEP in which it was concluded that behavior support, a one-to-one EBHA, trained by behavior specialists to strategies and implementation of the BIP and IEP, consultation services, training, and modeling by behavior support by staff and parents, were required.

The LEA's position from educator and witness testimony that it would have made no difference had there been a one-on-one aide present has little persuasive value.  The IEP of December 13, 2023 required the services.  The services required were not put in place. There was nothing but speculation as to what might have or might not have happened had

the IEP's provisions been implemented.  The point is that they were not implemented, specifically as to the behavior challenges by the Student and erratic actions which arose from them, including assaulting the assistant principal from behind her back.  The IEP placed the Student in this particular setting, and added particular supports and accommodations to allow him to be educated in this particular setting.  They were not provided, and perhaps predictably, tantrums and aggressiveness occurred after winter break.

The LEA's position that reversal of the manifestation determination will not have a practical effect because the Student is expected to return to school, *see* R's F&C (C), is unpersuasive.  If the IEP's manifestation decision is reversed by the Hearing Officer with a determination that the Student's behavior was a manifestation, then, much like the LEA making the determination in the first place with the Hearing Officer's decision stepping into its shoes, FAPE duties are placed again on the IEP Team to subsequently conduct an FBA, unless an FBA had been conducted before the behavior, and to implement a behavior plan, and review and modify that plan if a BIP had already been developed.  *See* 34 C.F.R. § 300.530(f).

It is, therefore, concluded that the Student's behavior was caused by, and also was in direct and substantial relationship to, the Student's disabilities, and (2) that the Student's behavior was the direct result of the LEA's failure to implement the Student's December 13, 2023 IEP, which was the IEP in force at the time to be implemented. 34 C.F.R. §§ 300.530, 531.

## ORDER

The LEA's change in suspension placement is reversed and the Student is administratively ordered to return to the placement from which the Student was removed prior to his removal.  34 C.F.R. § 300.532.  The Petitioner's request for an order to conduct a new FBA, or a modification, is denied.  The authority of the Hearing Officer is limited to returning the child to the prior placement.  *See* 34 C.F.R § 300.532(b)(2)(i).

The Petitioner's third and fourth issues, whether the LEA's removal of the Student to an IAES on January 29, 2024, and the resulting application of regular school discipline in a long-term suspension violated the Student's rights under the IDEA, and possible remedies, are dismissed without prejudice, at the request of the Petitioner.  *See* P's Argument, p. 3.

## REVIEW

Decisions on an expedited matter are appealable consistent with 34 C.F.R. § 300.514, which provides review process under 34 C.F.R. § 300.516, which provides that any party aggrieved by this decision has the right to bring a civil action in a court of competent jurisdiction pursuant to 20 U.S.C § 1415(i), 34 C.F.R. § 300.516, and § 6.31.2.13(I)(24) NMAC (2009). Any such action must be filed within 30 days of receipt of the hearing officer's decision by the appealing party.

It is so administratively ordered.

/s/ electronic

_____
MORGAN LYMAN

IMPARTIAL DUE PROCESS
HEARING OFFICER

Entered: March 15, 2024

## CERTIFICATE OF SERVICE

I certify a true copy hereof was sent via email attachment only to D. Poulin, L. Nesbitt, J. Staehlin, M. Lozano, and S. Perea, Esqs., with a copy to the New Mexico Secretary of Education through the submission to M. Lozano for the PED, all on this 15th day of March 2024.

/s/ electronic
_____